IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Uni-Marts, LLC., *et al.*,[1] | Case No. 08-11037 (MFW) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: September 22, 2009 at 4:00 p.m. (ET) |
| | Objections Due: September 15, 2009 at 4:00 p.m. (ET) |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING A SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, TRI-COLOR HOLDINGS, LLC AND CERTAIN RELATED ENTITIES**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby move the court for entry of an order, pursuant to section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in the form annexed hereto as Exhibit A (the "Proposed Order"), approving the terms of the settlement agreement (the "Settlement Agreement") by and among the Debtors, on the one hand, and, on the other hand, Tri-Color Holdings, LLC ("Tri-Color") and certain entities affiliated with or related to Tri-Color, including Henry Sahakian, Alex Sahakian, Ara Kervandjian, and Kota Holding Company, LLC (together with Tri-Color, the "Released Parties"). A true and correct copy of the Settlement Agreement is annexed hereto as Exhibit B. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following: Uni-Marts, LLC, Uni-Marts Ohio, LLC, Uni Realty of Wilkes-Barre, Inc., Uni Realty of Wilkes-Barre, L.P., Uni Realty of Luzerne, Inc., Uni Realty of Luzerne, L.P., and Green Valley National Accounts, LLC.

## I. Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

## II. Background

### A. The Chapter 11 Cases

2. On May 29, 2008 (the "Petition Date"), each of the Debtors filed with the Court their respective voluntary petitions for relief under chapter 11 the Bankruptcy Code commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 30, 2008, the Court entered an order authorizing the joint administration of these chapter 11 cases [Docket No. 26].

3. On June 9, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"). No trustee or examiner has been appointed.

4. A full description of the Debtors' business operations, corporate structure, capital structure, and reasons for commencing these cases is set forth in the Declaration of Alex D. Sahakian in Support of Chapter 11 Petitions and Related Motions [Docket No. 5] (the "Sahakian Declaration"). Additional facts in support of the specific relief sought herein are set forth below.

### B. The Settlement Agreement

5. Tri-Color is the sole member of Debtor Uni-Marts, LLC ("Uni-Marts"). Henry Sahakian, Alex Sahakian, and Ara Kervandjian are current members of Tri-Color and are managers of Uni-Marts. Kota Holdings Company, LLC ("Kota") is a former member of Uni-Marts. As described below, the Debtors, through their independent manager, have informally

asserted certain claims or causes of action against the Released Parties, which claims principally relate to distributions made by Debtor Uni-Marts to its members at the time, Tri-Color and Kota, during 2005 and 2006.

6. As was set forth in the Sahakian Declaration, after being taken private in 2004, Uni-Marts set about to implement a business strategy designed to de-leverage the company and to change the primary business strategy of the Debtors from an operator of convenience stores to a wholesale fuel supplier. First, in response to the success of a popular industry trend involving the ownership and operation of individual locations by entrepreneurial operators (known as "Dealers"), Uni-Marts implemented a structured process to sell approximately 255 of its convenience store locations to individual owner operators starting in 2004. As a result of this process, Uni-Marts sold a total of 161 of its convenience stores to Dealers, of which 152 were sold during 2005. In addition to purchasing the business, good-will, equipment and inventory at these locations, the majority of the Dealer operators entered into a 20-year, triple-net lease for each property with certain renewal options, a 20-year agreement to license the Uni-Marts and/or Choice brand name, and where applicable, a 10-year gasoline supply agreement, which is renewable at fair market terms to Uni-Marts and the Dealers at the end of the initial period. In return, certain of the Debtors offered to the Dealers certain support services, including marketing assistance, group buying discounts and regional supervision.

7. As the second prong of their business strategy, the Debtors adopted a sale approach that was prevalent in both the fuel distribution and convenience store industries during the early to mid-2000s. Specifically, during 2005 and 2006, the Debtors utilized advisors and brokers to market substantially all of the real estate underlying their convenience stores to institutions and investors for sale via sale/leaseback transactions. A majority of the sites were sold

to a public real estate investment trust, National Retail Properties Trust, in three separate transactions between August 2005 and July 2006. A number of other properties were sold to individual investors, generally in transactions carried out pursuant to section 1031 of the Internal Revenue Code.

8. The proceeds from the sale of businesses to Dealers and the sale/leaseback transactions were used for a number of corporate purposes, including to pay down substantially all of the Debtors' outstanding secured debt and to substantially de-leverage and improve the Debtors' capital structure. However, Uni-Marts also made significant distributions to its members, including twelve separate distributions totaling approximately $41 million to Tri-Color made between May 2005 and October 2006.[2] The Debtors, through their independent manager, reviewed the facts and circumstances surrounding those distributions, analyzed the various potential claims, and have informally asserted that some or all of those distributions may be recoverable from Tri-Color or subsequent transferees as constructively fraudulent conveyances. The Released Parties dispute these claims and assert that they have complete defenses to any cause of action that may be asserted by the Debtors or their estates. Furthermore, the Released Parties have informally asserted claims or causes of action against the Debtors or their estates, which the Debtors dispute and assert that they have defenses to any such claims or causes of action.

9. Pursuant to the terms of the Settlement Agreement, the Released Parties shall (i) pay to the Debtors One Million Dollars ($1,000,000) and (ii) grant releases to the Debtors and

---

[2] Upon information and belief, Tri-Color, in turn, distributed those amounts to Tri-Color's members, including certain of the other Released Parties. In addition, Uni-Marts also made distributions totaling approximately $27 million to Kota, which amounts upon information and belief were than distributed to the members or affiliates of Kota.

their estates with respect to any and all claims, rights or causes of action, except for certain indemnification claims or rights they may hold in their capacity as officers or managers of one or more of the Debtors. In exchange for that consideration, the Debtors have agreed to grant releases to the Released Parties for any claims or causes of action, whether known or unknown, they have had, now have or may have against the other party from the beginning of the world to the effective time of the Settlement Agreement.

10. After analyzing the facts and circumstances underlying each of the alleged claims, the significant costs and expenses that would be associated with pursuing those claims and causes of action, the potential delay attendant to pursuing the claims, the likelihood of success of those claims, and the potential problems of collecting any judgment recovered, the Debtors, acting through their independent manager, believe that the terms of the Settlement Agreement are fair and equitable, represent a reasonable resolution of the dispute between the parties and are in the best interest of the Debtors and their estates.

11. Additionally, the terms of the Settlement Agreement are nearly identical to the settlement provisions set forth in the proposed Asset Purchase Agreement (the "APA") between certain Debtor entities and Tri-Color, which was filed with this Court on July 20, 2009 [Docket No. 1052], whereby Tri-Color agreed to relinquish the One Million Dollar ($1,000,000) deposit to the Debtors' estate in exchange for broad mutual releases between the Debtors and Tri-Color. The APA was filed in connection with the *Motion of the Debtors for Entry of an Amended Order (I) Establishing Auction Procedures Related to the Potential Sale of Their Assets, and (II) Approving Deposit Waiver and Settlement Provisions of Stalking Horse Agreement* (the "Amended Bid Procedures Motion") [Docket No. 1015]. At the hearing on the Amended Bid Procedures held

before this Court on July 21, 2009, the Committee acknowledged that it supported and helped negotiate the settlement provisions set forth in the APA.

### III. Relief Requested

12. The Debtors request entry of the Proposed Order authorizing and approving the Settlement Agreement.

### IV. Argument

13. Section 105 of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. P. 9019(a).

14. Numerous courts, including courts in this circuit, have emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate 'compromises are favored in bankruptcy.'" *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (Bankr. D. Del 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990) (observing that "compromises are favored in bankruptcy and . . . much of litigation in bankruptcy estates results in settlements"). In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact that may be raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

15. Moreover, courts generally accord great deference to the recommendations of the trustee or debtor-in-possession when considering settlement agreements. *See Official Comm. of*

*Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989). In deciding whether a particular settlement falls within the "range of reasonableness," courts in this district generally consider the following factors:

(i) the probability of success in the litigation;

(ii) the difficulties associated with collection;

(iii) the complexity of the litigation, and the attendant expense, inconvenience and delay; and

(iv) the paramount interests of creditors.

*Id.* (citing *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1989); *Six West Retail Acquisitions, Inc. v. Loews Cineplex Entm't Corp.*, 286 B.R. 236, 248 n.13 (S.D.N.Y 2002); *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992).

16. The terms of the proposed Settlement Agreement are the result of extensive, good faith and arms'-length negotiations among the Debtors, acting through their independent manager, and the Released Parties. Further, the Debtors believe that the proposed Settlement Agreement is fair and equitable, falls well within the range of reasonableness with respect to the claims asserted, represents a significant benefit to the Debtors' estates and their creditors, and is the result of the exercise of sound business judgment. For the reasons set forth above, the Debtors submit that entry of the Proposed Order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 authorizing and approving the Settlement Agreement is appropriate.

## V. Notice

17. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Released Parties; and (d) to those parties that have filed a notice of appearance and demand for service in these cases. The Debtors submit that no further notice of this Motion is necessary or required.

## VI. Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter the Proposed Order authorizing and approving the Settlement Agreement and grant the Debtors such further relief as is just and equitable.

Dated: Wilmington, Delaware
September 2, 2009

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Chad A. Fights*
Robert J. Dehney (DE No. 3578)
Chad A. Fights (DE No. 5006)
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Telecopier: (302) 425-4673

-and-

HUNTON & WILLIAMS LLP
Tyler P. Brown (VSB No. 28072)
Michael G. Wilson (VSB No. 48927, DE No. 4022)
Henry P. Long, III (VSB No. 75134)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Telecopier: (804) 788-8218

*Attorneys for Debtors and Debtors in Possession*