**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Uni-Marts, LLC, et al., | ) | Case No. 08-11037 (MFW) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | Jointly Administered |

**MEMORANDUM OPINION[1]**

Before the Court is the Final Fee Application of Matrix
Capital Markets Group ("Matrix"), the Debtors' investment banker,
in which it seeks a fee enhancement of $103,397.  The Application
is supported by the Debtors and the Official Committee of
Unsecured Creditors (the "Committee"), and there has been no
objection to it by any party.  For the reasons stated below, the
Court will grant the request.


I.    <u>BACKGROUND</u>

Uni-Marts, LLC, and its affiliates (the "Debtors") operated
a chain of company-owned and franchise-operated convenience
stores and gas stations throughout the northeastern United
States.  In September 2007, the Debtors determined to sell their
business and hired Matrix as their investment banker.  As a
result of Matrix's efforts, the Debtors negotiated an agreement

---

[1]  This Memorandum Opinion constitutes the findings of fact
and conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, made applicable to
contested matters by Rule 9014 of the Federal Rules of Bankruptcy
Procedure.

with Atlantis Petroleum, L.L.C. ("Atlantis") pursuant to which Atlantis agreed to acquire substantially all of the Debtors' assets in Pennsylvania and New York.  The Debtors were unable to complete the transaction, however, because of deteriorating financial conditions.

As a result, the Debtors filed for relief under chapter 11 of the Bankruptcy Code on May 29, 2008.  Atlantis agreed to act as a stalking horse for a purchase price of approximately $17.7 million plus reimbursement for certain inventory.  The Debtors sought approval of bid procedures which contemplated sale of the assets as a whole or in groups of the Pennsylvania, New York and Ohio stores.  The Court approved Atlantis as the stalking horse and the bid procedures by Order dated July 10, 2008.

On June 3, 2008, the Debtors filed an application to retain Matrix as their investment banker to conduct the sale process in the bankruptcy case.  Pursuant to that retention application, Matrix sought reimbursement of all its expenses and compensation in the amount of 2.5% of the Transaction Value resulting from the sale of the Debtors' assets up to $15 million plus 3% of the value from $15 to $20 million and 4% of any value in excess of $20 million.  As a result of informal comments from the United States Trustee (the "UST"), an amended order authorizing the retention of Matrix on the above terms was entered on June 27, 2008.

2

At the conclusion of the sale process, the Atlantis bid was deemed the highest and best and the Court approved the sale to Atlantis by Order dated September 19, 2008.  Unfortunately, Atlantis was unable to finalize its financing, and the sale never closed.  As a result, Matrix continued its marketing efforts for the Debtors.  Ultimately, the sale procedures were modified by Order dated June 18, 2009, and the Debtors' stores were offered for sale individually and in small groups.

In connection with the second sales effort, Matrix contacted more than 3,000 potential purchasers, of whom 310 signed confidentiality agreements.  Over 100 bids were submitted. Matrix was instrumental in conducting a live auction of the Debtors' assets, at which 100 qualified bidders appeared.  That resulted in a combination of buyers being selected as the highest and best for the 206 remaining stores and related assets.  Those sales were approved by the Court in the summer and fall of 2009, and closings are in progress.  Kwik Pik acquired 138 stores and the remaining locations were sold to 25 separate buyers.  The total price to be received by the Debtors for all assets is estimated to be $2.2 million more than the Atlantis offer.

On or about October 30, 2009, Matrix filed its Final Fee Application which sought approval of expenses of $39,102.04[2] and

---

[2]  Matrix subsequently filed a Supplement to its fee application seeking additional expenses of $21,960.67 which were documented after it filed its initial fee application.

3

fees of $600,000.  The latter sum included a request for a fee
enhancement of $103,397.  The Debtors and the Committee supported
the request by Matrix.  A hearing was held on the Matrix fee
application on November 20, 2009, at which time the Court took
the matter under advisement.  Subsequently, the Court granted the
application in part and approved fees in the amount of $496,603
and all the expenses requested, in accordance with the retention
application.  The Court reserved ruling on the fee enhancement
request.  The matter is ripe for decision.


II.  JURISDICTION

     This Court has jurisdiction over this matter, which is a
core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A),
(B), & (O).


III. DISCUSSION

     A.  Bankruptcy Court Review of Professionals' Fees

     The Bankruptcy Court has an independent duty to review fee
requests of all professionals retained in a chapter 11 case to
assure that the services rendered were necessary and appropriate
and that the fees requested are reasonable.  See, e.g., In re
Busy Beaver Building Centers, Inc., 19 F.3d 833, 841 (3d Cir.
1994).

4

B.    Professionals' Retention Generally: Section 328(a)

The Bankruptcy Code expressly permits the retention of professionals on many different terms, including a percentage basis, an hourly rate or a flat fee.  11 U.S.C. § 328(a) (authorizing the debtor to employ a professional "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.").  Once the terms of a professional's retention have been approved, however, the Court may only change them "after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  Id.

C.    Matrix' Retention: Section 330(a)

In this case, the terms of Matrix' retention as set forth in the retention application was based strictly on a percentage of the value of the sale of the Debtors' assets.  This is not uncommon for retention of investment bankers.  However, the retention order expressly provided that the Court could review the compensation paid to Matrix at the conclusion of the engagement, not under the terms of section 328(a) but under the standards set forth in section 330.  Section 330 provides that professionals may be paid "reasonable compensation for actual, necessary services rendered by the . . . professional person . .

. [and] reimbursement for actual, necessary expenses." 11 U.S.C.
§ 330(a)(1).

Under section 330(a), the court may award "reasonable
compensation for actual, necessary services rendered" by a
professional "based on (i) the nature of the services, (ii) the
extent of the services, (iii) the value of the services, (iv) the
time spent on the services, and (v) the cost of comparable
services in non-bankruptcy cases." Busy Beaver, 19 F.3d at 840.
Analytically, section 330(a) provides a two-tiered test for
determining whether and in what amount to compensate bankruptcy
professionals. In re Gencor Industries, 286 B.R. 170, 176-77
(Bankr. M.D. Fla. 2002). First, the court must be satisfied that
the professional performed actual and necessary services. Id.
Second, the court must assess a reasonable value for those
services. Id.

Section 330 states that in determining the amount of
reasonable compensation

>    the court shall consider the nature, the extent, and
>    the value of such services, taking into account all
>    relevant factors, including -
>        (A) the time spent on such services;
>        (B) the rates charged for such services;
>        (C) whether the services were necessary to the
>        administration of, or beneficial at the time at
>        which the service was rendered toward the
>        completion of, a case under this title;
>        (D) whether the services were performed within a
>        reasonable amount of time commensurate with the
>        complexity, importance, and nature of the problem,
>        issue, or task addressed;
>        (E) with respect to a professional person, whether

the person is board certified or otherwise has
demonstrated skill and experience in the
bankruptcy field; and
(F) whether the compensation is reasonable based
on the customary compensation charged by
comparably skilled practitioners in cases other
than cases under this title.

11 U.S.C. § 330(a)(3).  These standards are typically applied in

considering whether compensation paid to a professional on an

hourly basis is reasonable, but as noted above, they are

expressly applicable to the fees requested by Matrix as a result

of the retention order.

    1.  <u>Time Spent</u>

Although Matrix did not keep detailed hourly records, it did

provide a daily summary of the hours spent, divided into various

categories (in increments of 1/2 hour), as part of an agreement

to satisfy the UST's informal comments on the retention

application.  This reveals that Matrix spent a total of 3,036

hours on the engagement.  When Matrix was originally retained, it

was contemplated that the sale to Atlantis (or a higher bidder at

the July auction) would be completed quickly.  Instead, when the

sale did not close, Matrix was required to re-market the Debtors'

assets and conduct a second, more time-intensive auction.

Matrix' fee application reveals that time spent by it on the

second sales process took more than 2050 hours.

2.   <u>Rates Charged</u>

If the total compensation requested (including the fee enhancement) is allowed, Matrix' blended hourly rate would be less than $200.  Without the fee enhancement, it would be less than $165.  Based on the Court's experience, both hourly rates are significantly less than what is typically paid to investment bankers in comparable cases.  <u>Busy Beaver</u>, 19 F.3d at 854 (directing that a judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, be the starting point for any analysis of the reasonableness of fee requests in chapter 11 cases).

3.   <u>Services Were Necessary and Beneficial</u>

Clearly the services rendered by Matrix were necessary and beneficial to the estate.  Matrix was instrumental in marketing the Debtors' assets, assisting potential buyers in doing due diligence and conducting the auction.  In particular, the services required of Matrix for the second sales effort were essential to the success of the Debtors' efforts to sell all their assets for the highest and best price.  Rather than having a stalking horse willing to purchase substantially all their assets, the Debtors were faced with the need to find several buyers for parts of their businesses.  Matrix had to scour the market to find buyers (contacting more than 3,000 prospects and

8

responding to over 300 due diligence requests) before ultimately
conducting an auction and reviewing more than 100 bids.  Without
Matrix' assistance the sale of the Debtors' assets could not have
been accomplished.  The results of those efforts are also
impressive.  The Debtors will receive more than $2.2 million over
the original stalking horse bid.  Thus the Court finds that the
services performed by Matrix were both necessary and beneficial
to the Debtors estates.

4.   <u>Time Spent Was Reasonable Under Circumstances</u>

Because the fee arrangement with Matrix was a percentage
fee, instead of an hourly fee, the fourth factor is not directly
applicable (being intended to assure that professionals do not
pad their time sheets but instead spend an appropriate amount of
time on each task).[3]  However, the Court finds that the scope of
the services performed by Matrix was appropriate in the
circumstances of this case.  Rather than conducting only one
marketing effort as it originally expected, Matrix was required
to assist in two separate marketing efforts, over a period in
excess of a year, thereby trebling the hours it spent on the
engagement.  That was not because Matrix was seeking to enhance
its fee but because the circumstances of the case mandated it.

---

[3]  In fact, the advantage of a percentage fee arrangement is
that it does not encourage a professional to waste time on
unproductive tasks.

5.   <u>Qualifications of Professionals</u>

Matrix (and particularly Mr. Kelso) is a well-qualified investment banker.  Matrix is particularly well-known in the convenience store industry.  Its retention was not opposed, and the Debtors and Committee have expressed satisfaction (and praise) for the ability shown by it in this case.

6.   <u>Customary Compensation</u>

"[T]he Court must conduct an objective inquiry 'based upon what services a reasonable [professional] would have performed in the same circumstances.'"  <u>In re Cenargo Int'l, PLC</u>,  294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003) (<u>quoting</u> <u>In re Ames Dep't Stores Inc.</u>, 76 F.3d 66, 72 (2d Cir. 1996)).

In this case, the compensation, taken as a whole, is not unreasonable and is well within the range of fees paid to similar professionals.  As noted, even with the enhanced fee, the blended hourly rate for Matrix professionals would be less than $200 per hour.  As a percentage, the fee is only 3% of the value received by the estate.  This, too, is well within the range of compensation typically paid to investment bankers for their assistance in preparing assets of the size and type owned by the Debtors for sale and conducting a marketing and auction process.

7.   <u>Other Factors</u>

The Court was initially reluctant to even consider the fee enhancement request of Matrix.  Since investment bankers

typically are compensated on a percentage basis, the Court felt that Matrix should bear the risk of a lower compensation if the sale was not a success, just as it would have reaped the reward if the sale was wildly successful.

The support of the Debtors and the Creditors' Committee was a major factor in the Court agreeing to consider the enhanced fee request.  It is also significant that no party in interest filed any objection to the fee enhancement.

After reviewing the request under the standards of section 330(a) and based on the rather unique circumstances of this case, where Matrix had to conduct a second marketing effort and auction, the Court is satisfied that the fee enhancement request should be granted.

IV.  CONCLUSION

For the reasons set forth above, the Court will grant the fee enhancement requested by Matrix Capital Markets Group.

An appropriate Order is attached.


Dated: March 31, 2010                    BY THE COURT:

                                         Mary F. Walrath
                                         United States Bankruptcy Judge

11